## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PRINCIPAL GROWTH STRATEGIES, LLC, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2019-0431-JTL |
| AGH PARENT LLC, *et al.*, | ) ) | |
| Defendants. | ) ) | |

## OPINION

Date Submitted: October 17, 2022
Date Decided: January 9, 2023

Brett D. Fallon, FAEGRE DRINKER BIDDLE & REATH LLP, Wilmington, Delaware; Warren E. Gluck, Richard A. Bixter, Jr., HOLLAND & KNIGHT LLP, New York, New York; *Attorneys for Plaintiffs*.

R. Craig Martin, Amy Evans, DLA PIPER LLP (US), Wilmington, Delaware; Ellen E. Dew, DLA PIPER LLP (US), Baltimore, Maryland; Aidan M. McCormack, R. Brian Seibert, Steven M. Rosato, DLA PIPER LLP (US), New York, New York; *Attorneys for Defendants Senior Health Insurance Company of Pennsylvania (in Rehabilitation) and Fuzion Analytics, Inc.*

**LASTER, V.C.**

A Pennsylvania-domiciled insurance company is in rehabilitation under the jurisdiction of a Pennsylvania court. A management company that is a wholly owned subsidiary of the Pennsylvania-domiciled insurance company is not part of the rehabilitation proceeding. The plaintiffs have sued the insurance company and the management company, who have asked the court to stay this action in deference to the rehabilitation proceeding.

This court explained in *In re Liquidation of Freestone Insurance Co.*, 143 A.3d 1234 (Del. Ch. 2016), that a combination of considerations associated with state-court insurance delinquency proceedings calls for presumptively limiting the ability of parties to litigate against the delinquent insurer in other forums. In *Freestone*, this court was presiding over the insurance delinquency proceeding, and the issue was whether to lift a broad anti-suit injunction to permit litigation to proceed against the delinquent insurer in another state. A stay application presents the same issue, albeit in a setting where this court is presiding over the collateral litigation rather than the delinquency proceeding.

The *Freestone* decision identified a series of factors for the court to consider when deciding whether to depart from the presumption against permitting collateral proceedings to go forward against the delinquent insurer. Those factors support a stay in this case as to the delinquent insurer. They do not support a stay as to the management company. The motion for a stay is therefore granted as to the insurance company and otherwise denied.

## I. FACTUAL BACKGROUND

The factual background is drawn from the operative complaint, the documents that it incorporates by reference, and the submissions made by the parties in connection with the motion to stay.[1]

### A. The Pennsylvania Insurer

Senior Health Insurance Company of Pennsylvania ("SHIP") is a Pennsylvania-domiciled life and health insurance company. Its origins date to 1887, when its corporate predecessor, the Home Beneficial Society, started providing insurance. By the 1980s, the company was known as American Travelers Insurance Company, and it had entered the then-nascent business of providing long-term care insurance, which covers the services provided by nursing homes, assisted living facilities, and adult day care centers. In 1996, the conglomerate Conseco, Inc. acquired the company and renamed it Conseco Senior Health Insurance Company ("Conseco Health"). Conseco Health was licensed in forty-six states (excluding Connecticut, New York, Rhode Island, and Vermont), the District of Columbia, and the U.S. Virgin Islands.

In 2002, Conseco filed for reorganization under Chapter 11 of the United States Bankruptcy Code. In 2003, Conseco, Inc. emerged from bankruptcy as CNO Financial Group. That same year, Conseco Health went into runoff, meaning that it stopped writing new policies for long-term care insurance and limited its operations to the administration

---

[1] Citations in the form "Ex. — at —" refer to exhibits that the defendants submitted. Page citations refer to the internal pagination.

and servicing of existing policies. Directly or through its predecessors, Conseco Health had issued approximately 645,000 long-term care policies. Approximately half of the policyholders paid a premium; the others either were on premium waivers or had previously chosen a nonforfeiture option, under which a policyholder stops paying premiums in exchange for coverage equal to the premiums previously paid less any benefits previously received. The runoff was expected to be solvent, meaning that the premiums already paid or to be paid on the policies would be sufficient to cover all expenses, including benefits.

In 2008, the Pennsylvania Insurance Commissioner oversaw a transaction in which CNO transferred the ownership of Conseco Health to the Senior Health Care Oversight Trust (the "Oversight Trust"), and the company adopted its current name. At the time, the runoff was expected to remain solvent.

In 2012, SHIP's management team decided that they had gained considerable experience managing a distressed long-term care insurer and might be able to market that expertise to other distressed insurers. They caused the Oversight Trust to form a new entity called Fuzion Analytics, Inc., that would pursue that business.

Over time, Fuzion began managing more and more of SHIP's operations and affairs. In 2014, SHIP conveyed substantially all of its infrastructure, including its contractual arrangements with its executives and employees, to Fuzion in exchange for $367,806. The conveyance resulted in SHIP having no facilities and no employees. Going forward, SHIP relied exclusively on Fuzion and other vendors to perform all of its business functions.

3

**B.     SHIP's Entanglements With Platinum Management And Beechwood**

By 2014, changes in the long-term care industry had caused the claims expectations for SHIP's policies to increase by over $200 million. SHIP needed to increase its reserves to match its expected claims. Fuzion thought that a reinsurer could help SHIP increase its reserves by managing the assets to generate greater returns.

Around that time, an investment fund complex that did business under the name "Platinum Partners" began targeting distressed insurers as part of a reinsurance scheme. Platinum Partners' central entity was Platinum Management (NY) LLC, which sponsored and managed various hedge funds.

Platinum Management had caused two of its hedge funds to make risky and illiquid investments (the "Platinum Funds"). The investments performed poorly, and by 2012, the Platinum Funds needed liquidity. Platinum Management saw the reinsurance business as a source of liquidity. In a reinsurance transaction, one insurance company (the reinsurer) receives a fee for agreeing to pay the losses on a group of policies written by another insurance company (the cedent). If the reinsurer does not cover the losses, then the cedent remains liable to its policyholders.

As part of the reinsurance transaction, the cedent transfers premium and reserves associated with the covered policies to the reinsurer. In theory, the reinsurer manages the reserves and, over time, uses the reserves plus its own financial strength to pay the claims associated with the transferred risks.

For Platinum Management, reinsurance offered access to investable reserves. Platinum Management could use those reserves to address the Platinum Funds' liquidity

4

crisis and mask the funds' losses through transactions that would bid up the prices of the funds' assets.

To tap the reinsurance market, Platinum Management created a series of affiliated entities that did business under the name "Beechwood." Through Beechwood, Platinum Management focused on selling reinsurance to distressed insurers that had difficulty securing reinsurance coverage.

Beechwood initially succeeded in entering into reinsurance agreements with insurance companies affiliated with CNO. Like SHIP, those subsidiaries had written long-term care policies, but unlike SHIP, they had remained subsidiaries of CNO (the "CNO Companies").

Through relationships with the CNO Companies, Fuzion heard about Beechwood. Soon, Fuzion had caused SHIP to enter into a series of investment management agreements that granted Beechwood discretion to invest pools of assets on SHIP's behalf.

Beechwood used the funds from the CNO Companies and SHIP to engage in a series of transactions involving Platinum-sponsored investments. In this action, everyone agrees that Platinum Management and Beechwood entered into transactions that were designed to support inflated valuations for the risky assets owned by the Platinum Funds. Those valuations hid the Platinum Funds' losses and enabled Platinum Management to pay itself both transaction-based fees and larger asset-based fees.

## C.    The Fallout From The Reinsurance Scheme

The vast majority of the Platinum-sponsored investments that Beechwood made did not turn out well. Before long, the portfolios that Beechwood was managing for SHIP and the CNO Companies held a mix of nearly worthless debt and equity investments.

After entrusting Beechwood with SHIP's reserves, Fuzion began to have concerns about what Beechwood was doing. Fuzion questioned the relationship between Beechwood and Platinum Management and expressed doubts about the quality of the investments that Beechwood had made.

In 2016, Fuzion's concerns turned to panic when news broke about an investigation by the U.S. Attorney's Office for the Southern District of New York into Platinum Management's business dealings. On June 8, the CEO of Platinum Management was arrested and charged with bribery and other criminal counts. Platinum Management promptly announced that it would wind down and liquidate one of the Platinum Funds.

Fuzion was suddenly confronted with the fact that SHIP's obligations to its policyholders were secured by poorly performing and overvalued investments sponsored by a firm whose CEO had been arrested. The CNO Companies were in a similarly unpalatable situation.

Fuzion demanded SHIP's reserves back. The CNO Companies also wanted out. Their desire to extract whatever they could from the sinking Platinum ship matched up with the short-term interests of Platinum Management and its principals. Through Beechwood, they similarly wanted to extract whatever value they could before everything went under.

The plan was to swap lots of bad assets for one good one. The Platinum Funds had made a high-risk investment that actually turned out well. Agera Energy LLC was a promising energy company. When Agera reorganized under the Bankruptcy Code, the Platinum Funds acquired a promissory note convertible into approximately 95% of its equity (the "Agera Note"). As the reorganized entity prospered, the value of the Agera Note increased. To extract value from the Platinum Funds, Beechwood, SHIP, and the CNO Companies entered into a multi-step transaction in which they exchanged their near-worthless investments for the Platinum Funds' valuable ownership interest in the Agera Note (the "Agera Transaction").

As the first step in the Agera Transaction, Beechwood created a new Delaware limited liability company named AGH Parent LLC. Beechwood, SHIP, and the CNO Companies assigned their worthless interests in Platinum-sponsored investments to AGH Parent in exchange for member interests in AGH Parent.[2]

In the second step of the Agera Transaction, the Platinum Funds transferred their interest in the Agera Note to a special purpose vehicle called Principal Growth Strategies, LLC. Together, the Platinum Funds owned 100% of the equity of Principal Growth.

In the third step of the Agera Transaction, Principal Growth transferred the Agera Note to AGH Parent. In exchange, Principal Growth received a package of securities from

---

[2] Beechwood participated through defendants BHLN-Agera Corp., BOLN-Agera Corp., BBLN-Agera Corp., which Beechwood formed to hold its share of the investments that it made on behalf of SHIP and the CNO Companies.

7

AGH Parent that were ostensibly valued at $170 million. The valuation alone represented a significant discount to the fair market value of the Agera Note. Moreover, the assets that Principal Growth received were not worth anywhere close to $170 million. Of the total amount, AGH Parent paid only $65,293,540 in cash. The next $43,666,460 consisted of poorly performing debt and equity investments in Platinum-affiliated entities that AGH Parent had received from Beechwood, the CNO Companies, and SHIP. The final $61,040,000 consisted of junior equity interests in AGH Parent: 3,438 Class B-2 Units valued at $2 million and 590,400 Class C Units valued at $59,040,000.

The Class C Units that AGH Parent issued to the Principal Growth were another way for Beechwood, SHIP, and the CNO Companies to increase their share of the value of the Agera Note at the expense of Principal Growth and the Platinum Funds. Under AGH Parent's operating agreement, AGH Parent had the right to redeem 354,000 of the Class C Units owned by Principal Growth for more poorly performing debt and equity investments in Platinum-affiliated companies with a face value of $35.4 million. Through that mechanism, AGH Parent could force feed additional worthless securities to Principal Growth in return for equity interests that could benefit from the value of the Agera Note. With 354,000 Class C Units no longer outstanding, the proportionate ownership of the other holders of AGH Parent's equity would increase.

Immediately after the Agera Transaction, Fuzion cut a deal to exchange SHIP's remaining interest in Platinum-sponsored investments for additional equity interests in AGH Parent. In October 2016, AGH Parent exercised its redemption right and stuffed Principal Growth with more bad investments in exchange for 354,000 Class C Units.

8

In July 2017, nine months after the Agera Transaction, AGH Parent was sold to a third-party buyer for $230 million. As the holders of senior equity positions in AGH Parent, Beechwood, SHIP, and the CNO Companies received sizable portions of the consideration. Rather than suffering major losses along with other investors in the Platinum Funds, Beechwood, SHIP, and the CNO Companies had gotten out.

## D.   The Lawsuits

The fallout from the criminal investigation into Platinum Management spawned a multitude of lawsuits.

- In August 2016, Platinum Management filed a voluntary petition to liquidate one of the Platinum Funds—Platinum Partners Value Arbitrage Fund L.P.—in the Grand Court of the Cayman Islands. The court appointed plaintiffs Martin Trott and Christopher Smith as the Joint Official Liquidators (the "Joint Liquidators").

- In December 2016, the United States Court for the Eastern District of New York unsealed an indictment against Platinum Management and various Platinum executives.

- Also in December 2016, the Securities and Exchange Commission ("SEC") commenced a civil action against Platinum Management and various Platinum executives. The SEC subsequently obtained an order appointing a receiver for the second of the Platinum Funds—Platinum Partners Credit Opportunities Master Fund L.P. ("Platinum Credit").

- In July 2018, SHIP filed a complaint in the United States District Court for the Southern District of New York against Beechwood and its affiliates asserting claims for breach of contract, breach of fiduciary duty, fraud, and civil RICO. *In re Platinum-Beechwood*, No. 18-cv-06658 (S.D.N.Y. July 24, 2018).

- In November 2018, the Joint Liquidators filed an action in the United States District Court for the Southern District of New York against Platinum Management and Beechwood asserting twenty-one counts, including breach of fiduciary duty, fraud, aiding and abetting, civil conspiracy, and civil RICO. *Trott v. Platinum Mgmt. (NY) LLC,* No. 18-cv-10936 (S.D.N.Y. Nov. 21, 2018).

9

- In March 2019, the receiver for Platinum Credit filed an action in the United States District Court for the Southern District of New York against Beechwood, its affiliates, and the insurance companies. *In re Platinum-Beechwood Litig.*, 427 F. Supp. 3d 395 (S.D.N.Y. 2019). The receiver contended that Beechwood had engaged in fraud and breaches of fiduciary duty and that the insurance defendants had aided and abetted those torts. The lawsuit did not address the Agera Transaction. *Id.* at 424.

The actions pending in the Southern District of New York have been consolidated before the Honorable Jed S. Rakoff. *See In re Platinum-Beechwood Litig.*, No. 18-cv-6658, Dkt. 91, 94.

### E.    This Litigation

Principal Growth and the Joint Liquidators filed this action on June 7, 2019. The operative complaint contains six counts. Five of those counts seek to recover from SHIP and Fuzion.

On August 20, 2019, the Oversight Trust conveyed all of its interest in Fuzion to SHIP as a capital contribution. As a result, Fuzion is now a wholly owned subsidiary of SHIP. As of December 31, 2019, SHIP carried Fuzion on its balance sheet at a value of $2.9 million and had recorded a net receivable from Fuzion of $49,541. In addition to providing services to SHIP, Fuzion continues to provide services to other insurers in the long-term care industry.

By order dated January 29, 2020, the Commonwealth Court of Pennsylvania (the "Pennsylvania Court") placed SHIP into rehabilitation (the "Rehabilitation Proceeding"). The court appointed the Commissioner of the Pennsylvania Insurance Department as rehabilitator and charged the Commissioner with taking possession of the assets of SHIP, administering the assets in accordance with the orders of the Pennsylvania Court, and

rehabilitating the business of SHIP. The Commissioner appointed a special deputy rehabilitator and delegated those tasks to the special deputy (the "Rehabilitator").

On September 21, 2020, SHIP and Fuzion moved to dismiss this action on various grounds. One of their arguments was that the court must stay or dismiss this proceeding in deference to the Rehabilitation Proceeding. The parties did not cite or discuss *Freestone*, nor did they provide important information about the Rehabilitation Proceeding. The court directed the parties to provide supplemental briefing.

On August 24, 2021, the Pennsylvania Court approved a rehabilitation plan for SHIP (the "Rehabilitation Plan"). *See In Re Senior Health Ins. Co. of Pennsylvania In Rehab.*, 266 A.3d 1141 (Pa. Commw. Ct. 2021). In reaching its decision to approve the Rehabilitation Plan, the Pennsylvania Court found that SHIP had approximately $1.4 billion in assets and $2.6 billion in liabilities, producing a deficit of approximately $1.2 billion (the "Funding Gap"). The stated goal of the Rehabilitation Plan is to eliminate the Funding Gap by increasing premium revenue and by modifying the terms of a majority of the approximately 39,000 policies currently in force. *Id.* at 1146, 1186.

The Pennsylvania Court rejected the alternative of liquidating SHIP without first attempting rehabilitation. The Pennsylvania Court explained that an immediate liquidation had no prospect of addressing the Funding Gap. *Id.* at 1168–69. It also would not address SHIP's "discriminatory and inequitable" practice of charging higher premiums in states whose regulators were willing to approve rate increases, then using those higher premiums to support all of its policies, including in states where regulators refused to approve rate increases. That practice forced policyholders in some states to subsidize policyholders in

11

other states. *Id.* at 1169. Rehabilitation also would offer policyholders better terms for coverage than they would receive in a liquidation from the state guaranty association that would step forward to pay off claims against a liquidating insurer.[3]

The Rehabilitation Plan contemplates a three-phase process. During the first phase, the Rehabilitator and SHIP will focus on paying claims from policyholders and making efforts to reduce the Funding Gap. The Pennsylvania Court found that a principal reason for the Funding Gap was a mismatch between the benefits that SHIP's policies provided and the premiums that the policyholders were paying. To reduce the Funding Gap, the Rehabilitation Plan offers existing policyholders a choice. One option is to maintain the level of benefits while agreeing to pay a higher, actuarially justified premium. The other option is to maintain the premium while accepting a reduced level of actuarially justified benefits. There is also a nonforfeiture option in which the insured stops paying premium and receives an actuarially justified level of benefits based on premiums paid to date.

After the first phase, the Pennsylvania Court will evaluate the results to determine whether additional policy modifications may be necessary to eliminate the Funding Gap. If a Funding Gap remains, then the rehabilitation will enter a second phase in which the

---

[3] *Id.* at 1168. After an insurer enters liquidation, an insurance guaranty association generally assumes the insolvent insurer's obligations to its policyholders. Some state statutes cap the amount of coverage that a guaranty association must provide, even if the insurance company had agreed to provide greater coverage. *See generally* 43 Am. Jur. 2d *Insurance* § 107; *see also* 40 Pa. Stat. Ann. § 991.1703 (describing guaranty association limitations for claims under Pennsylvania law). Statutory coverage caps apply separately on a per policy basis and to the coverages within policies. 44 C.J.S. *Insurance* § 241.

12

Pennsylvania Court may require policyholders to pay increased premiums, accept reduced benefits, or a combination of the two. Ex. A at 23.

During the third phase, the Rehabilitator will complete the runoff of SHIP's long-term care insurance business. *Id.* If SHIP is unable to pay off its liabilities in full during phase three, SHIP will be placed into formal liquidation. *Id.* at 81.

Under the Rehabilitation Plan, claims against SHIP's assets are classified into five categories. Listed in decreasing order of priority, those categories are: (i) administrative expenses, (ii) policyholder liabilities, (iii) certain federal priority claims, (iv) general creditor claims, and (v) equity claims. *Id.* at 21–22. Payments are made *pro rata* within each category, and no payments can be made on claims in a lower category until all higher categories have been paid in full or reasonable provision has been made for their full payment.

If the plaintiffs in this action are successful in their claims against SHIP, then their claims will constitute general creditor claims and fall into category four of the Rehabilitation Plan. *See id.* at 22. SHIP's general creditors, including the plaintiffs, cannot receive any payment unless and until all senior claims are paid, including all policyholder claims. *See id.* at 23.

The Rehabilitation Plan does not include Fuzion, and Fuzion is not a party to the Rehabilitation Proceeding. SHIP's financial statements describe Fuzion as a noninsurance company. *See id.* at 142 ("The Company reports Fuzion Analytics, Inc., a non-insurance [sic] company, at audited GAAP equity."); *accord id.* at 152 ("The Company has an investment in downstream noninsurance holding companies, Fuzion Analytics, Inc."). The

13

Rehabilitation Plan recognizes that Fuzion is a wholly owned subsidiary under SHIP's control and that Fuzion continues to provide management and administrative services to SHIP, but it does not otherwise address Fuzion. *Id.* at 91, 102.

## II.    LEGAL ANALYSIS

"Insurer insolvency is regulated by state law rather than the federal Bankruptcy Code." *Cohen v. State ex rel. Stewart*, 89 A.3d 65, 72 (Del. 2014). In 1945, Congress adopted the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–1015, which provides that "[t]he business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business." 15 U.S.C. § 1012(a); *see Prudential Ins. Co. v. Benjamin,* 328 U.S. 408, 429 (1946). Congress also has carved out insurance companies from the purview of the Bankruptcy Code. 11 U.S.C. § 109(b). "As a result, the states have primary responsibility for regulating insurance, including insurance company insolvency proceedings." *Freestone*, 143 A.3d at 1243.

Three generations of model legislation have sought to bring order to this important area. The first-generation statute is the Uniform Insurers Liquidation Act (the "Uniform Act"), promulgated in 1939 by the National Conference of Commissioners on Uniform State Laws with the assistance of the American Bar Association, the National Association of Insurance Commissioners, the insurance departments of several states, and other qualified experts. *See Commissioner's Prefatory Note*, *Uniform Insurers Liquidation Act*, 9B Unif. L. Annotated 284, 286 (1966). As many as thirty-two jurisdictions adopted the

14

Uniform Act in some form.[4] The Uniform Act was withdrawn in 1981 due to obsolescence.[5]

Delaware adopted the Uniform Act in 1953. *See* 18 *Del. C.* § 5920 (1953) (declaring that the provisions being enacted "constitute and may be referred to as the Uniform Insurers Liquidation Act"). Judicial decisions sometimes refer to Delaware's version of the Uniform Act as the "DUILA." Today, Delaware is one of twenty-three jurisdictions that still use at least parts of the Uniform Act, notwithstanding its obsolescence.[6]

---

[4] *Lac D'Amiante du Quebec, Ltee. v. Am. Home Assurance Co.*, 864 F.2d 1033, 1039 (3d Cir. 1988).

[5] [13 Part II] Unif. L. Annotated 126 (2002) ("The Uniform Insurers Liquidation Act (1939) was withdrawn from recommendation for enactment by the National Conference of Commissioners on Uniform States Laws in 1981 due to it being obsolete."); *see* Am. Bankr. Inst., *State Insurance Company Insolvency Proceedings-Looks Like a Bankruptcy, Walks Like a Bankruptcy*, at n.4 (July 13, 2006), *available at* Westlaw, 060713 ABI-CLE 129 ("The National Conference of Commissioners on Uniform State Laws withdrew the [Uniform Act] in 1981 due to its obsolescence."); Nat'l Ass'n of Ins. Comm'rs, *Receiver's Handbook for Insurance Company Insolvencies* 478 n.20 (2021) [hereinafter *Receiver's Handbook*] ("Note that the [Uniform Act] was withdrawn from recommendation for enactment by the National Conference of Commissioners on Uniform State Laws in 1981 due to it being obsolete."). At the time it was withdrawn, thirty states had insurance statutes that were substantially similar to the Uniform Act. *See* Nat'l Conf. of Comm'rs on U.S. Laws, *Handbook of the National Conference of Commissioners on United States Laws and Proceedings of the Annual Conference Meeting in Its Eighty-Ninth Year* 481 (1982) (listing the states that had adopted the Uniform Act by 1980).

As a side note, the citation format for Volume 13, Part II, of the Uniform Laws Annotated is admittedly bizarre, but nevertheless called for. *See The Bluebook: A Uniform System of Citation* R. 3.1(a), at 72 (Columbia L. Rev. Ass'n et al. eds., 21st ed. 2020) ("If a volume designation includes words, use brackets to avoid confusion.").

[6] Nat'l Ass'n of Ins. Comm'rs, *Insurer Receivership Model Act State Page Key*, at ST-555-2 (2021), *available at* https://content.naic.org/sites/default/files/model-law-state-page-555.pdf [hereinafter *IRMA State Page Key*]. As the court noted in a prior decision, it

15

The second-generation statute is the Insurers Rehabilitation and Liquidation Model Act ("IRLA" or "Model Act"), promulgated in 1968 by the National Association of Insurance Commissioners ("NAIC") and based largely on the Wisconsin Insurers Liquidation Act.[7] The Model Act carried over much of the terminology used in the Uniform Act,[8] but the Model Act also made changes intended to clarify and improve on the Uniform

---

represents something of an embarrassment for a state that prides itself on having modern and efficient business laws to continue to apply a statutory scheme that the promulgating authority withdrew as obsolete more than forty years ago. *Matter of Scot. Re (U.S.), Inc.*, 273 A.3d 277, 308 (Del. Ch. 2022). I respectfully reiterate my hope for "a Reaganesque morning in Delaware for insurance companies" in which we update our statutory scheme for delinquency proceedings. *Id.* at 309.

[7] *See* Mary Cannon Veed, *Cutting the Gordian Knot: Long-Tail Claims in Insurance Insolvencies*, 34 Tort & Ins. L.J. 167, 174 (1998) (identifying the Wisconsin Insurer's Liquidation Act as the template for the IRLA); David A. Skeel, Jr., *The Law and Finance of Bank and Insurance Insolvency Regulation*, 76 Tex. L. Rev. 723, 731 (1998) (same). The NAIC amended the IRLA several times over the years. *See generally Receiver's Handbook*, *supra*.

[8] *Receiver's Handbook*, *supra*, at 466–67 ("Ten sections (54–63) of the Model Act adopt much of the [Uniform Act], as well as its policy objective: centralization of delinquency proceedings in the domiciliary jurisdiction."); *accord* Stephen W. Schwab et al., *Cross-Border Insurance Insolvencies: The Search for a Forum Concursus*, 12 U. Pa. J. Int'l. Bus. L. 303, 325 (1991) [hereinafter *Cross-Border Insurance Insolvencies*] (explaining that the Model Act adopts "much of the basic terminology and procedure of the [Uniform Act], as well as the same universalist policy objective: centralization of delinquency proceedings in the domiciliary jurisdiction").

Act.[9] Thirty-one states plus the District of Columbia and Puerto Rico have enacted components of the Model Act.[10] Pennsylvania is one of those states.

The third-generation act is the Insurer Receivership Model Act ("IRMA"), promulgated in 2005 by the NAIC as an updated version of the Model Act. *Receiver's Handbook*, *supra*, at 463. As of January 2023, only two states—Texas and Utah—have adopted IRMA in its entirety. *IRMA State Page Key*, *supra*. Four other states—Maine, Missouri, Oklahoma, and Tennessee—have adopted portions of the IRMA. *Id.*

The Uniform Act and its successor statutes seek to centralize delinquency proceedings involving an insurer within the jurisdiction where the entity is domiciled,

---

[9] *See Cross-Border Insurance Insolvencies*, *supra*, at 325 ("Differences between the two statutes derive from the NAIC's efforts to clarify and improve [Uniform Act] provisions."); Eric P. Berg, Note, *Injunctions Barring Suit Against Insolvent Insurance Companies: State Cooperation Through Tit-for-Tat Strategy*, 57 Rutgers L. Rev. 1377, 1379, 1384 (2005) (describing the Model Act as "more detailed" and "more comprehensive" than the Uniform Act but as providing "a framework supporting the same policies").

[10] *IRMA* State *Page Key*; *see* Alaska Stat. §§ 21.78.010–.330; Colo. Rev. Stat. §§ 10-3-401 to -559; Conn. Gen. Stat. §§ 38a-903 to -962j; D.C. Code §§ 31-1301 to -1357; Ga. Code Ann. §§ 33-37-1 to -58; Haw. Rev. Stat. §§ 431:15-101 to -411; Idaho Code §§ 41-3301 to -3360; Ind. Code §§ 27-9-1-1 to -4-10; Iowa Code §§ 507C.1–.60; Kan. Stat. Ann. §§ 40-3605 to -3659; Ky. Rev. Stat. Ann. §§ 304.33-010 to -600; Mich. Comp. Laws Ch. 500, §§ 8101–8159; Minn. Stat. §§ 60B.01–.61; Miss. Code Ann. §§ 83-24-1 to -117; Mont. Code Ann. §§ 33-2-1301 to -1394; Neb. Rev. Stat. §§ 44-4801 to -4862; Nev. Rev. Stat. §§ 696B.010–.570; N.H. Rev. Stat. Ann. §§ 402-C:1–:61; N.J. Stat. Ann. §§ 17B:32-31 to -92; N.C. Gen. Stat. §§ 58-30-1 to -310; N.D. Cent. Code §§ 26.1-06.1-01 to -59; Ohio Rev. Code Ann. §§ 3903.01–.99; Okla. Stat. tit. 36, §§ 1901–1938; Or. Rev. Stat. §§ 734.014–.440; 40 Pa. Stat. Ann. §§ 221.1–.63; P.R. Laws Ann. tit. 26, §§ 4001–4054; R.I. Gen. Laws §§ 27-14.3-1 to -65; S.C. Code Ann. §§ 38-27-10 to -1000; S.D. Codified Laws §§ 58-29B-1 to -161; Vt. Stat. Ann. tit. 8, §§ 7031–7100; Wash. Rev. Code §§ 48.31.010–.435; W. Va. Code §§ 33-10-1 to -41; Wis. Stat. §§ 645.01–.90.

under the oversight of the domiciliary state's insurance regulator. *Freestone*, 143 A.3d at 1244. Multiple statutory features evidence the importance of this goal and seek to facilitate it. *See id.* at 1244–49.

One of those statutory features is express authority for the court overseeing a delinquency proceeding to issue anti-suit injunctions to protect the primacy of the delinquency proceeding. *Id.* at 1249. Although the judicial power to issue anti-suit injunctions would exist independently, the Uniform Act takes the additional step of granting the court specific statutory authority to issue anti-suit injunctions. *Id.* (citing 18 *Del. C.* § 5904(b)). *See generally Cohen*, 88 A.3d at 90.

The plain language of the Uniform Act makes the issuance of an anti-suit injunction discretionary. *See In re Rehab. of Manhattan Re–Ins. Co. (Manhattan Re)*, 2011 WL 4553582, at *8 (Del. Ch. Oct. 4, 2011).

> But the fact that the drafters of the Uniform Act took pains to specify the existence of this authority, which the domiciliary court otherwise would have, suggests . . . that they viewed the issuance of anti-suit injunctions as consistent with the public policies animating the Uniform Act and wished to signal that a court should exercise that authority in a delinquency proceeding more readily than it would in a different context.

*Freestone*, 143 A.3d at 1249–50 (internal citation omitted). "Perhaps unsurprisingly, anti-suit injunctions are routinely entered in delinquency proceedings." *Id.* at 1250.

In *Freestone*, this court had entered an anti-suit injunction at the outset of a delinquency proceeding, and a creditor asked the court to lift the anti-suit injunction so it could pursue litigation against the delinquent insurer in another state. 143 A.3d at 1250–51. The court explained:

18

> Given the statutory structure of the Uniform Act, its fundamental goal of centralizing delinquency proceedings under the control of the chief insurance regulator in the domiciliary jurisdiction, and the role of anti-suit injunctions in serving that public policy, a strong presumption exists that an existing anti-suit injunction should not be lifted to permit a claimant to litigate against the insolvent insurer in a foreign jurisdiction.

*Id.* at 1251–52 (internal citation omitted). The existence of a presumption does not mean that collateral litigation should never be allowed to proceed, and this court has recognized that there could be rare circumstances when lifting an anti-suit injunction "would not be inconsistent with the statute or its goal[s]." *Manhattan Re*, 2011 WL 4553582, at *5.

Drawing a careful analogy to the Bankruptcy Code and the lifting of the automatic stay, the *Freestone* decision identified a series of factors to consider when deciding whether to lift an anti-suit injunction. They are:

(1) The nature and extent of any connection between the foreign litigation and the domestic liquidation proceeding, including:

    a. Whether the foreign litigation involves the insolvent domestic insurer holding property in a custodial or fiduciary capacity, or as a bailee or conduit for the goods or proceeds in question, or

    b. Whether the insolvent domestic insurer itself has insurance coverage that will cover the foreign litigation and whether the carrier has assumed full financial responsibility for the foreign litigation.

(2) The interests of judicial efficiency and litigant economy, including:

    a. Whether the foreign litigation can decide the issue more efficiently and expeditiously than the domestic liquidation proceeding;

    b. Whether a specialized tribunal has been established to hear the particular cause of action and that tribunal has the expertise to hear such cases;

    c. How far the foreign litigation has progressed, and

19

(3) Whether the foreign litigation will completely resolve the issues presented in that litigation.[11]

(4) Whether the foreign litigation would prejudice the interests of the Commissioner, other claimants, or other interested parties, including:

   a. Whether the foreign litigation is likely to result in a judgment that will give rise to a claim entitled to a recovery in the domestic liquidation proceeding given its priority under the Uniform Act;

   b. The amount of the likely payment relative to the burden on the insolvent domestic insurer, and

   c. Whether the claim that would result from the foreign judgment would be subject to equitable subordination or other doctrines.

(5) The balance of hardships and whether the party wishing to proceed with foreign litigation has shown that the hardship it would suffer from not being able to proceed considerably outweighs the hardship to the Commissioner and the insolvent domestic insurer.

*Id.* at 1254–56 (internal citation omitted). As with other multi-factor tests, the factors are not intended to be exclusive or exhaustive, and the balancing is not a mathematical exercise. *Id.* at 1256.

Courts outside of the domiciliary state must also consider the implications of collateral litigation for a delinquency proceeding. In this case, SHIP and Fuzion have moved to stay this proceeding in deference to the Rehabilitation Proceeding. When SHIP and Fuzion presented their motion, they framed it as involving a traditional application of

---

[11] The *Freestone* decision considered this issue as a component of the second factor—the interests of judicial efficiency and litigant economy. This decision elevates the issue to a standalone factor. The enumerated *Freestone* factors are non-exclusive, and some factors may prove more or less useful over time. In this dispute, the distinction between SHIP and Fuzion highlights the significance of whether the collateral litigation will completely resolve the dispute.

20

the *forum non conveniens* factors in which the analysis is tipped in favor a stay because the Rehabilitation Proceeding was purportedly a first-filed action to which deference was due under *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Engineering Co.*, 263 A.2d 281 (Del. 1970). *See Focus Fin. P'rs, LLC v. Holsopple*, 250 A.3d 939, 952–53 (Del. Ch. 2020) (discussing implications of first-filed action for *forum non conveniens* analysis). During oral argument, the court noted that a request to stay collateral litigation in deference to a delinquency proceeding is the functional equivalent of a request for an anti-suit injunction, although made to the court presiding over the collateral litigation rather than the court presiding over the delinquency proceeding. The court therefore asked the parties to address why the *Freestone* approach would not apply by analogy, *i.e.*, a presumption that the case would be stayed unless the *Freestone* factors supported a different result.

The court also asked the parties whether the distinction between a liquidation and a rehabilitation should make a difference when analyzing the *Freestone* factors. "The purpose of a rehabilitation is to enable the delinquent insurer to emerge as a going concern that can pay its debts as they come due in the ordinary course of business." *Scot. Re*, 273 A.3d at 283. A liquidation proceeding involves winding up the insurance company's operations, marshaling its assets, making payments to claimants in order of priority until its assets are exhausted, and then ending its existence. *Id.* at 299. A rehabilitation is like a surgical or medicinal intervention. A liquidation proceeding involves hospice care

21

followed by the administration of last rites.[12] As a practical matter, a liquidation proceeding invariably contemplates a claims process, while a rehabilitation may not. The court asked the parties to address whether the same policy considerations that applied to a liquidation and favored requiring claimants to present their claims as part of the liquidation process would also apply to a rehabilitation without a claims process where the expectation was that the insurer would be able to return to health.

This case thus presents a threshold issue of whether the *Freestone* analysis or a *McWane* analysis should apply to the stay application. Assuming the former applies, the next question is whether the distinction between a rehabilitation and a liquidation makes a difference. Once that question is addressed, the final step is to apply the *Freestone* factors to the facts of the case.

## A.     *Freestone* Versus *McWane*

The first question is whether this court should apply a version of the *Freestone* framework or simply conduct a standard *forum non conveniens* analysis. The answer to that question seems relatively easy. The *forum non conveniens* analysis is a general framework. It is not tailored to an insurance company delinquency proceeding. The

---

[12] *See Freestone*, 143 A.3d at 1254 ("[A]n insurance liquidation proceeding under state law represents the culmination of the regulation of its business by the chief regulator of the domiciliary state, effectuated (to borrow a religious analogy coined by Justice Jack B. Jacobs) through the regulator's administration of last rites to the regulated entity" (citing Jack B. Jacobs, *Delaware Receivers and Trustees: Unsung Ministers of Corporate Last Rites*, 7 Del. J. Corp. L. 251 (1982)).

*Freestone* framework is more specific and was designed with an insurance company delinquency proceeding in mind. The specific should prevail over the general.

A deeper dive into the *forum non conveniens* factors shows that they are not well-suited when one of the two cases is an insurance company delinquency proceeding. When evaluating a motion based on *forum non conveniens*, a Delaware court considers the so-called "*Cryo-Maid* factors." *See Gen. Foods Corp. v. Cryo-Maid, Inc.*, 198 A.2d 681, 684 (Del. 1964) (subsequent history omitted). In paraphrased form, they are:

> (1) the existence of other litigation involving substantially similar parties or subject matter;
>
> (2) whether the controversy depends upon a question of Delaware law which the courts of this State more properly should decide than those of another jurisdiction;
>
> (3) the relative ease of access to proof;
>
> (4) the availability of compulsory process for witnesses; and
>
> (5) any other matters that would affect the conduct of the litigation and the expeditious and economic administration of justice.

*Id.* The paraphrased list identifies the factors in their relative order of importance for corporate and commercial disputes.[13] "Together, these factors have come to form the core

---

[13] The list omits a sixth *Cryo-Maid* factor—"the possibility of the view of the premises"—because that factor is typically irrelevant to corporate and commercial disputes. *See, e.g.*, *Hall v. Maritek Corp.,* 170 A.3d 149, 162 (Del. Super. Ct. 2017) ("[T]he third *Cryo-Maid* factor holds little to no weight even in a case where there was a relevant premises that the fact-finder might want to view.") (internal quotations omitted), *aff'd*, 182 A.3d 113 (Del. 2018); *Hamilton P'rs, L.P. v. England*, 11 A.3d 1180, 1212 n.17 (Del. Ch. 2010) (collecting authorities). A view of the premises is not relevant to this case, and this decision therefore does not discuss it.

of Delaware's traditional *forum non conveniens* analysis." *Gramercy Emerging Mkts. Fund v. Allied Irish Banks, P.L.C.*, 173 A.3d 1033, 1036 (Del. 2017).

The first *Cryo-Maid* factor asks whether there is (i) an earlier-filed action, (ii) between the same or substantially similar parties, (iii) addressing the same or substantially similar subject matter, (iv) pending in a court capable of addressing the matter in a just way (a "Prior Action"). Whether this factor is satisfied affects the approach the court takes to balancing the *Cryo-Maid* factors. *Id.* at 1036–38.

If a Prior Action exists and remains pending, then a Delaware court approaches the *Cryo-Maid* factors with the analysis tilted in favor of the defendant. Under an approach known as the *"McWane* doctrine," the court will dismiss or stay the Delaware action in deference to the Prior Action unless the *Cryo-Maid* factors weigh heavily in favor of allowing the Delaware action to proceed. *Id.* at 1037. Generally speaking, the calculus only will favor denying the motion and permitting the Delaware action to move forward if the Delaware plaintiff has invoked a specialized statutory proceeding designed to address a particular issue or if Delaware otherwise has a particularly strong interest in the dispute. *See Holsopple*, 250 A.3d at 953–54, 956.

If a Prior Action once existed but is no longer pending, then the Delaware court conducts a straightforward assessment of the *Cryo-Maid* factors to determine where it makes the most sense for the action to proceed. The resulting analysis "is not tilted in favor of the plaintiff or the defendant." *Gramercy*, 173 A.3d at 1044.

If the Delaware case is the first-filed action, then the court will approach the *Cryo-Maid* factors with the analysis tilted in favor of the plaintiff. The court generally will allow

the Delaware action to proceed unless the defendant shows that it would face overwhelming hardship or inconvenience from litigating in Delaware. *Id.* Although the test sounds extreme, trial judges should not perceive that the standard "suggests an insurmountable burden for defendants." *Martinez v. E.I. DuPont de Nemours & Co.,* 86 A.3d 1102, 1105 (Del. 2014). "[I]t is intended as a stringent standard that holds defendants who seek to deprive a plaintiff of her chosen forum to an appropriately high burden." *Id.* What is required is that the *Cryo-Maid* factors weigh "heavily and decisively" in favor of dismissal. *IM2 Merch. & Mfg., Inc. v. Tirex Corp.*, 2000 WL 1664168, at *1 (Del. Ch. Nov. 2, 2000); *see Martinez*, 86 A.3d at 1105 (discussing *IM2* with approval and agreeing that "a more restrained meaning is at the essence of the [overwhelming hardship] standard") (quoting *IM2*, 2000 WL 1664168, at *8 (bracketed text in original)).

The *forum non conveniens* factors do not match up well with the special considerations associated with insurance company delinquency proceedings. The predominant emphasis that the *forum non conveniens* analysis places on the first-filed proceeding ignores the important policy interests that call for concentrating litigation involving a delinquent insurer in the domiciliary court.[14] The fact that litigation elsewhere

---

[14] *Cf., e.g.*, *Receiver's Handbook*, supra, at 466–67 ("Ten sections (54–63) of the Model Act adopt much of the [Uniform Act], as well as its policy objective: centralization of delinquency proceedings in the domiciliary jurisdiction."); Stephen W. Schwab et al., *Cross-Border Insurance Insolvencies: The Search for a Forum Concursus*, 12 U. Pa. J. Int'l. Bus. L. 303, 325 (1991) (explaining that the Model Act adopts "much of the basic terminology and procedure of the [Uniform Act], as well as the same universalist policy objective: centralization of delinquency proceedings in the domiciliary jurisdiction").

was prior filed does not matter. Just as the filing of a petition under the Bankruptcy Code triggers an automatic stay that extends to pending litigation,[15] so too the filing of a delinquency proceeding warrants presumptively staying prior-filed litigation.[16] A court might well take into account whether prior-filed collateral litigation has advanced significantly and is near conclusion when determining whether to grant a stay, but not in the manner that the *forum non conveniens* factor contemplates.

The emphasis given to whether a dispute involves Delaware law under the *forum non conveniens* analysis also does not carry over to the insurance company context. "Choice of law under *Cryo-Maid* operates as a proxy for Delaware's interests, and the analysis must address the degree to which Delaware has a particular interest in the subject matter of the case." *Hamilton*, 11 A.3d at 1213. For an insurance company delinquency proceeding, the policy interest in limiting litigation to the domiciliary state is more

_____

[15] 11 U.S.C. § 362(a)(1) (providing that the filing of a bankruptcy petition "operates as a stay, applicable to all entities, of . . . the commencement or continuation . . . of a judicial, administrative or other action of proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title").

[16] *See Idaho Tr. Bank v. BancInsure, Inc.,* 2014 WL 4064063, at *6 (D. Idaho Aug. 15, 2014) ("The [Uniform Act] permits, and even anticipates, that all other proceedings in the nature of claims against the company will be stayed and resolved instead in the liquidation process. . . . Such circumstances are, in fact, directly analogous to bankruptcy cases."); Berg, *supra*, at 57 (describing the granting of anti-suit injunctions in an insurance company delinquency proceeding as "a right that aims at achieving the advantage provided by the Federal Bankruptcy Code's automatic stay and exclusive jurisdiction provisions").

26

important. A court still can consider Delaware's interest in a case, but not in the way that the *forum non conveniens* analysis envisions.

The other *forum non conveniens* factors examine issues relating to the practicality of litigating in Delaware as compared to another state. Absent an overarching regulatory reason to concentrate proceedings in a single jurisdiction and avoid collateral litigation, those considerations make sense. With an insurance company delinquency proceeding, considerations about relative practicality are secondary.

The *Freestone* factors focus specifically on the relationship between an insurance company delinquency proceeding and collateral litigation. The *Freestone* factors permit a court to consider the elements of a *forum non conveniens* analysis, but within a framework tailored to the more specific setting. The *Freestone* factors therefore provide the proper framework for analyzing this case.

## B. Is Rehabilitation Different From Liquidation?

The next question is whether the *Freestone* presumption against collateral litigation and in favor of channeling claimants into a claims process in the domiciliary state makes sense when the insurer is undergoing rehabilitation rather than liquidation. Although the court raised this issue as a possible distinction and asked the parties to address it, the court is now convinced that the same policy considerations that counsel against permitting collateral litigation to proceed during a liquidation also apply to a rehabilitation. As the *Freestone* decision explained, "[f]orcing the Commissioner to defend lawsuits in multiple jurisdictions dissipates the distressed insurer's assets by necessitating expenditures of limited resources on foreign litigation." 143 A.3d at 1251. Collateral litigation also distracts

27

a rehabilitator from the primary task of managing the delinquent insurer's affairs. *See id.* By contrast, staying collateral litigation permits a rehabilitator to focus on restoring the delinquent insurer to health. *See id.* at 1250. And staying collateral litigation minimizes the risk of inconsistent rulings and avoids the piecemeal adjudication of claims. *See id.*

To be sure, the existence of a claims process with a priority scheme provides an additional reason to avoid collateral litigation when an insurer is in liquidation.

> Particularly if the claims pursued in the foreign litigation will have a low priority such that their owners will be unlikely to recover even if successful, the practical result of the foreign litigation is to dissipate the insolvent insurer's limited financial resources for no purpose. Rather than funding distributions to higher priority claimants, those resources fund legal fees and other transaction costs.

*Id.* at 1251. That rationale initially might not seem to apply to a rehabilitation, but pausing collateral litigation yields benefits for a rehabilitation nonetheless. The automatic stay in the Bankruptcy Code again provides a model. Its purpose is "to prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or *rehabilitation* of the debtor." *St. Croix Condo. Owners Assoc. v. St. Croix Hotel*, 682 F.2d 446, 448 (3d Cir.1982) (emphasis added); *accord In re Scarborough–St. James Corp.*, 535 B.R. 60, 68 (Bankr. D. Del. 2015). Those considerations apply equally to an insurer in a state court delinquency proceeding. *Freestone*, 143 A.32 at 1252.

Ultimately, the distinction between a rehabilitation and a liquidation is neither stark nor permanent. A rehabilitation can have a claims process. *See Scot. Re*, 273 A.3d at 303

28

("Both a distribution of claims from the insurer's general assets and a claims process can be part of a rehabilitation plan."). And if a rehabilitation is unsuccessful, it can transition into a liquidation.[17] In either setting, the goal of avoiding prejudice to the domiciliary proceeding applies, as does the rationale for not litigating claims outside of a claims process—and particularly not low-priority claims.

Although there might be a case where the distinction between rehabilitation and liquidation could matter, this case is not it. The Rehabilitation Plan does not seek to return SHIP to a pre-runoff level of profitability that will enable the Company to re-establish itself as a going concern. The Rehabilitation Plan has the more limited goal of reducing the Funding Gap so that SHIP can complete a solvent runoff. The Rehabilitation Plan seeks to achieve that goal by right-sizing the match between premiums paid and policy benefits. It also seeks to protect policyholders by giving them the opportunity to receive greater benefits than they would receive in a liquidation. *See* Ex. A at 12–15 (summarizing features of Rehabilitation Plan). And it seeks to minimize the need to shift responsibility for the underpricing of SHIP's policies from SHIP to taxpayers. *See* Ex. B at 14. Even if the Rehabilitation Plan is successful, the winding down and termination of SHIP's business

---

[17] 9 Patrick H. Cantilo et al., *New Appleman on Insurance Law Library Edition* § 100.01[2] at 100-11 (Jeffrey E. Thomas & Susan Lyons eds., 2014); *Receiver's Handbook*, *supra*, at 8 ("Rehabilitation can be used as a mechanism to remedy an insurer's problems, to run off its liabilities to avoid liquidation, or to prepare the insurer for liquidation."); Francine Semaya & William K. Broudy, *A Primer on Insurance Receiverships*, Brief, Fall 2010, at 28 ("The rehabilitator manages the insurer's affairs for an indefinite time period, until the company can be returned to its prior management, or perhaps new management, or it is placed in liquidation.").

remain inevitable. The only variable is whether it happens through a solvent runoff or through an earlier liquidation. The Rehabilitation Plan makes clear that the efforts to restore SHIP to a solvent runoff may not succeed and that an earlier liquidation may be necessary. Ex. A at 8, 14, 69–81, 95. To that end, the Rehabilitation Plan includes a priority framework for paying claims which makes clear that if the plaintiffs succeed on their claims, they will be general creditors and fall into the fourth category, below all senior creditors and above only equity claimants. The plaintiffs only will recover *pro rata* with other general creditors.

The *Freestone* factors provide an appropriate framework for considering the current stay application, even though SHIP is in rehabilitation rather than liquidation. The same policy considerations apply, the absence of a claims process is not dispositive, and the Rehabilitation Plan has already taken the step of establishing a priority scheme.

## C.    Applying The *Freestone* Factors To The Claims Against SHIP

The next challenge is to apply the *Freestone* framework to the claims against SHIP. The plaintiffs argue that the party seeking a stay bears the burden of persuading the court that a stay is warranted. As the *Freestone* decision explained, the nature of an insurance delinquency proceeding gives rise to a presumption against allowing collateral litigation to proceed in other jurisdictions. 143 A.3d at 1240. Once a defendant has pointed to a delinquency proceeding that warrants applying the *Freestone* factors, as is the case here, then the plaintiffs bear the burden of persuading the court that they should be permitted "to litigate against an insolvent insurer outside of the delinquency proceeding." *Id.* 1254–55

(internal citation omitted). That burden "is a heavy one," with any doubts resolved against permitting the litigation to proceed. *Id.* at 1255. As to SHIP, the plaintiffs have not met it.

1. **The Nature And Extent Of Any Relationship Between The Claims Against SHIP And The Delinquency Proceeding**

Tailored to this case, the first *Freestone* factor examines the nature and extent of any connection between the collateral litigation and the insurance delinquency proceeding, together with the risk that the foreign proceeding could interfere with the delinquency proceeding. *Freestone*, 143 A.3d at 1256. The closer the connection is between the collateral litigation and the delinquency proceeding, the greater the likelihood of interference. *Id.* If the collateral litigation relates to a core function of the receivership, such as marshaling assets or assessing claims, then this factor counsels against permitting the collateral litigation to proceed. *Id.*

There are situations where this factor could support permitting collateral litigation to proceed. For example, "a suit against the insolvent insurer that did not actually seek to establish a claim against the insurer, but which instead sought to secure property or assets that the insurer was holding in a custodial or fiduciary capacity," would not interfere with the delinquency proceeding *Id.* at 1257. Nor would a lawsuit where "the insolvent insurer is not itself at risk, such as where the insurer itself had insurance coverage that will cover the foreign litigation and the carrier has agreed to assume full financial responsibility for the foreign litigation." *Id.* at 1257–58 (internal citation omitted).

Through their claims in this case, the plaintiffs seek to impose liability on SHIP itself. That is precisely the type of litigation that interferes with a delinquency proceeding.

31

The plaintiffs point out that SHIP has at least $10 million in insurance coverage, but that amount falls far short of the more than $200 million that the plaintiffs seek to recover. SHIP remains at risk for a judgment in this proceeding. The first *Freestone* factor therefore weighs in favor of a stay.

## 2. The Interests Of Judicial Efficiency And Litigant Economy For The Claims Against SHIP

The second *Freestone* factor takes into account considerations of judicial efficiency and litigant economy. *Freestone*, 143 A.3d at 1258. Pertinent considerations include how far the collateral litigation has progressed and whether the collateral litigation will proceed in a specialized tribunal that has been established to hear the particular cause of action. *Id.*

The current action has not proceeded past the pleading stage. It is not close to being resolved, nor have the court and the parties invested significant resources in the claims against SHIP. And while the Court of Chancery is a court of equity, it is not a specialized tribunal that has been established to hear the particular causes of action at issue in this case. Because the case involves a damages claim for breach of the limited liability company agreement of AGH Parent, the court has jurisdiction under Section 18-111 of the Delaware Limited Liability Company Act, 6 *Del. C.* § 18-111. That section grants concurrent jurisdiction to the Court of Chancery, which the court shares with Delaware's court of general jurisdiction, the Delaware Superior Court. *See Duff v. Innovative Discovery LLC*, 2012 WL 6096586, at *6 (Del. Ch. Dec. 7, 2012) ("[T]he statute's use of the word 'may' means that the jurisdiction it authorizes is concurrent, as opposed to exclusive. Consequently, litigants . . . who state a claim under 6 *Del. C.* § 18–111, have a choice of

32

pursuing that claim in the Court of Chancery or in another appropriate forum."). The second *Freestone* factor therefore weighs in favor of a stay.

### 3. Whether The Collateral Litigation Will Resolve The Entire Dispute For The Claims Against SHIP

The third *Freestone* factor that this decision considers is whether the collateral litigation can proceed as standalone litigation that will completely resolve the claims and avoid any need for them to be addressed in the insurance proceeding. *Freestone*, 143 A.3d at 1258. The plaintiffs concede that if they were to succeed in proving their claims against SHIP, the Pennsylvania Court still would need to determine whether any part of that judgment would be satisfied.[18] The third factor therefore weighs in favor of a stay.

### 4. Prejudice To The Interests Of The Rehabilitator Or Other Interested Parties From The Claims Against SHIP

The fourth *Freestone* factor that this decision considers is whether proceeding with the collateral litigation would be likely to prejudice the interests of the insurance commissioner overseeing the delinquency proceeding, other claimants, or other interested parties. *Freestone*, 143 A.3d at 1261. Permitting the plaintiffs to proceed with their claims against SHIP will present a distraction to the Rehabilitator, who will have to expend resources to defend the claims. This factor favors a stay.

---

[18] Dkt 120 at 27 ("[A]ll that would remain for the Rehabilitation Court to do would be to determine that Plaintiffs' judgment is a general creditor claim (which no one disputes) and determine whether (as Movants assert) payment on the claim must wait for Phase Three of the Plan or whether (as Plaintiffs assert) the Plan gives the Rehabilitation Court discretion to direct SHIP to pay a judgment 'in the ordinary course.'").

**5. The Balance Of The Hardships For The Claims Against SHIP**

The fifth *Freestone* factor that this decision considers is the balance of hardships. *Freestone*, 143 A.3d at 1262. From the Rehabilitator's perspective, being forced to defend claims against SHIP yields no benefits, only burdens. The Rehabilitator will have to expend resources to defend the action, and the litigation will be a distraction from the task of rehabilitating SHIP.

From the plaintiffs' perspective, a stay of this action as to SHIP will impose burdens. The Rehabilitation Proceeding could take years to complete, and the plaintiffs will not be able to move forward during that time. During those years, memories will fade, and evidence could be lost. On the other hand, the plaintiffs only seek monetary damages, and any harm from the lost time value of money can be addressed through an award of interest. Moreover, any judgment that the plaintiffs eventually obtained against SHIP would fall into the category of general creditor claims, and those creditors only will receive a *pro rata* payment if all of the policyholders' claims and other higher-priority claimants are paid. At present, there is uncertainty about whether all of the policyholders' claims will be paid, so there is doubt about whether the plaintiffs can recover anything.

Both sides can point to potential prejudice. The overlay of an insurance company delinquency proceeding strengthens the prejudice as to SHIP, and the possibility that the plaintiffs might not recover anything against SHIP, even if they prevailed on their claims, weakens the prejudice as to them. The balancing is nevertheless close, causing this factor to support a stay moderately.

34

**6.      Weighing The Factors As A Whole For The Claims Against SHIP**

The final step is to balance the *Freestone* factors as a whole. For purposes of the claims against SHIP, the balancing is straightforward. All of the *Freestone* factors point in favor of a stay, although the fifth factor only favors a stay moderately. SHIP's motion to stay this case is therefore granted.

**D.      Applying The *Freestone* Factors To The Claims Against Fuzion**

In addition to suing SHIP, the plaintiffs have sued Fuzion. In seeking a stay, Fuzion contends that the *Freestone* factors apply to the same degree as to SHIP because the claims against Fuzion cannot be divorced from the claims against SHIP. They further claim that because Fuzion's equity is an asset of SHIP, any judgment against Fuzion would have to be processed as a claim against SHIP. Fuzion's position is incorrect. Fuzion is a separate entity from SHIP that is not encompassed by the Rehabilitation Proceeding. Regardless, the *Freestone* factors do not support a stay as to the claims against Fuzion.

Fuzion is a Delaware corporation. "[O]ur corporation law is largely built on the idea that the separate legal existence of corporate entities should be respected—even when those separate corporate entities are under common ownership and control." *Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1038 (Del. Ch. 2006). "The corporation is an entity, distinct from its stockholders even if the subsidiary's stock is wholly owned by one person or corporation." *Buechner v. Farbenfabriken Bayer Aktiengesellschaft*, 154 A.2d 684, 686–87 (Del. 1959) (internal citation omitted). "Delaware courts have upheld the legal significance of corporate form, in a corporate-subsidiary complex, despite the fact of substantial overlap in the management and control of the two entities." *Leslie v.*

35

*Telephonics Off. Tech., Inc.*, 1993 WL 547188, at *8 & n.13 (Dec. 30, 1993) (Allen, C.) (collecting cases). "Mere control and even total ownership of one corporation by another is not sufficient to warrant the disregard of a separate corporate entity." *Skouras v. Admiralty Enters., Inc.*, 386 A.2d 674, 681 (Del. Ch. 1978) (citations omitted).

Fuzion is a separate entity that is independent of SHIP. Fuzion's equity is an asset of SHIP, and SHIP controls Fuzion by virtue of owning all of its equity, but Fuzion remains a distinct corporation. Ex. A at 102. From a legal perspective, Fuzion is a provider of services to SHIP, just like SHIP's accountants, its counsel, its landlord, and its internet provider. Fuzion provides management services to SHIP and receives compensation in return. *Id.* at 123. Fuzion also provides management services to other insurers. *Id.* at 91. Consistent with that reality, SHIP describes Fuzion as a *noninsurance* company. *See id.* at 142 ("The Company reports Fuzion Analytics, Inc., a non-insurance [sic] company, at audited GAAP equity."); *see also id.* at 152 ("The Company has an investment in downstream noninsurance holding companies, Fuzion Analytics, Inc.").

Fuzion is not part of the Rehabilitation Proceeding. As a noninsurance subsidiary, Fuzion does not fall within the purview of state receivership law. If Fuzion were insolvent, it would be able to seek protection under the Bankruptcy Code. *See Receiver's Handbook*, *supra*, at 498.

Because Fuzion is not part of the Rehabilitation Proceeding, the *Freestone* factors do not apply. Nor is there a prior action that could support the application of *forum non conveniens*, much less a prior action that would tip the analysis of the *Cryo-Maid* factors in favor of a stay.

36

Fuzion is therefore not entitled to a stay. The court nevertheless will assume for the sake of argument that the *Freestone* framework applies. Even under that framework, which is designed to favor a stay, the factors do not support one.

## 1. The Nature And Extent Of The Relationship Between The Claims Against Fuzion And The Delinquency Proceeding

To reiterate, the first *Freestone* factor examines the nature and extent of any connection between the collateral litigation and the insurance delinquency proceeding, together with the risk that the foreign proceeding could interfere with the delinquency proceeding. *Freestone*, 143 A.3d at 1256. Because Fuzion is not a part of the Rehabilitation Proceeding, the claims against Fuzion will not interfere directly with the Rehabilitation Proceeding. A claim against Fuzion does not represent a claim against SHIP. In their claims against Fuzion, the plaintiffs do not seek to impose liability on SHIP.

Fuzion argues that because it shares insurance coverage with SHIP, permitting the plaintiffs to pursue a claim that Fuzion must defend will deplete the insurance coverage available to SHIP. That may be true, but Fuzion's insurance coverage is Fuzion's asset. If Fuzion decides to tap that asset, it has the right to do so. The indirect effect on SHIP's ability to access the same policy is not sufficient. The first *Freestone* factor therefore weighs against a stay.

## 2. The Interests Of Judicial Efficiency And Litigant Economy For The Claims Against Fuzion

The second *Freestone* factor incorporates the interests of judicial efficiency and litigant economy. *Freestone*, 143 A.3d at 1258. Pertinent considerations under this heading include how far the collateral litigation has progressed and whether the collateral litigation

will proceed in a specialized tribunal that has been established to hear the particular cause of action. As discussed previously, the current action has not proceeded past the pleading stage, and this court is not a specialized tribunal. This factor favors a stay.

3. **Whether The Collateral Litigation Will Resolve The Entire Dispute For The Claims Against Fuzion**

The third *Freestone* factor that this decision considers is whether the collateral litigation can proceed as standalone litigation that will completely resolve the claims and avoid any need for them to be addressed in the insurance proceeding. *Freestone*, 143 A.3d at 1258. Unlike the claims against SHIP, this action can completely resolve the claims against Fuzion. Any judgment rendered in this case will be a claim against Fuzion, not SHIP. There is no credible basis to think that the plaintiffs could pierce Fuzion's corporate veil to reach assets of SHIP, particularly after relying on Fuzion's separate corporate identity to defeat a motion to stay. Principles of judicial estoppel would prevent the plaintiffs from reversing course later and seeking to impose liability on SHIP for a judgment against Fuzion. There is thus no possibility that a claim against Fuzion would have to be addressed by the Pennsylvania Court as part of a claims process in the Rehabilitation Proceeding. The third factor therefore counsels against a stay.

4. **Prejudice To The Interests Of The Rehabilitator Or Other Interested Parties From The Claims Against Fuzion**

The fourth *Freestone* factor that this decision considers is whether proceeding with the collateral litigation would be likely to prejudice the interests of the insurance commissioner overseeing the delinquency proceeding, other claimants, or other interested

38

parties. *Freestone*, 143 A.3d at 1261. There is no meaningful prejudice to the Rehabilitator or SHIP, so this factor does not support a stay.

For the reasons already discussed, there is no direct risk of prejudice to the Rehabilitator or to other claimants against SHIP because the claims in this litigation are against Fuzion. A judgment against Fuzion only will apply to Fuzion. It will not extend to SHIP, and it therefore will not affect other claimants against SHIP. Because of that fact, the Rehabilitator need not devote resources to monitoring the litigation against Fuzion. The claims against Fuzion are Fuzion's problem, not SHIP's.

There is potentially an indirect effect on SHIP in the form of management distraction. Fuzion provides management services to SHIP, and it is possible that the executives and employees of Fuzion could be distracted if they have to collect documents or provide depositions in this litigation. But that prejudice, limited as it is, is traceable to the decision by SHIP management in 2012 to have the Oversight Trust create Fuzion as a separate entity that could provide management services not only to SHIP but also to other distressed insurers. Presumably there were benefits to that step. Having received the benefits of operating as a separate company and not as an in-house management team, Fuzion must now take the bitter with the sweet. Fuzion is no differently situated than any other provider of services to SHIP that faces a distraction from third-party litigation. SHIP's other service providers cannot invoke the Rehabilitation Proceeding to avoid litigation, and Fuzion cannot either.

A judgment in this litigation could have an indirect effect on SHIP to the extent SHIP receives distributions from Fuzion or hopes to sell its equity interest in Fuzion to

39

generate funds that could be used to pay claims. If the plaintiffs prevail in their litigation against Fuzion, then the plaintiffs will be creditors of Fuzion and have priority over the claims of Fuzion's stockholders. That outcome is a function of the absolute priority rule and derives from the reality that Fuzion has a corporate existence separate from SHIP. As a stockholder, SHIP is only entitled to the residual value of Fuzion's assets, to the extent any exists after Fuzion's debts have been paid. Pennsylvania's interest in regulating the business of insurance is what entitles the Rehabilitation Proceeding to deference. When an insurer makes investments in operating companies that engage in other lines of business, the companies in which the insurer invests are not transformed into insurance companies. Non-insurance businesses do not get special dispensation to avoid creditors' claims simply because they are wholly owned subsidiaries of an insurer.

The fact that Fuzion can attempt to rely on its ownership by SHIP is a function of the August 2019 decision by the Oversight Trust to convey its interest in Fuzion to SHIP as a capital contribution. That transaction occurred after this case was filed, while the claims against Fuzion were pending. In that transaction, SHIP did not receive the value of Fuzion's business free and clear of any claims against the entity. As a stockholder, SHIP only holds a residual claim on the value of Fuzion *after* Fuzion pays its creditors, including any claim resulting from this proceeding. If SHIP has been valuing Fuzion without taking into account potential claims, then that is SHIP's mistake.

The claims against Fuzion do not impose any cognizable prejudice on the Rehabilitator or SHIP. This factor does not support a stay.

40

**5.      The Balance Of The Hardships For The Claims Against Fuzion**

The fifth *Freestone* factor that this decision considers is the balance of hardships. *Freestone*, 143 A.3d at 1262. When addressing the preceding *Freestone* factor, this decision discussed the possibility of prejudice to the Rehabilitator and SHIP, viewing that prejudice as non-cognizable for purposes of the claim against Fuzion. The prejudice to the plaintiffs is both cognizable and meaningful.

The plaintiffs currently have a path to pursue a damages claim against Fuzion. Yes, the plaintiffs are only seeking monetary damages, and if a stay were granted, then any harm from the lost time value of money could be addressed through an award of interest, but the plaintiffs would have to wait—potentially for years—until the end of the Rehabilitation Proceeding. There is also the potential harm from the possible loss of evidence and faded memories, and there are the inefficiencies associated with litigating claims twice—once against the defendants other than Fuzion and then a second time, after the Rehabilitation Proceeding is over, against Fuzion.

Where SHIP was concerned, the public polices surrounding an insurance delinquency proceeding made the prejudice to SHIP more significant. At the same time, the likelihood that the plaintiffs would be relegated to a claims process in which they could receive nothing made the prejudice to the plaintiffs less significant. For the claims against Fuzion, which is not a party to the Rehabilitation Proceeding, those additional considerations are absent. What remains is prejudice to the plaintiffs, without meaningful countervailing considerations. The balancing of hardships therefore counsels against a stay.

41

**6.** **Weighing The Factors As A Whole For The Claims Against Fuzion**

The final step is to balance the *Freestone* factors as a whole. The first and third factors weigh against a stay. The second factor favors a stay moderately. The fourth factor does not support a stay. The fifth factor weighs against a stay. The strongest considerations are the first and fifth factors. Thus, even if the court uses the framework for evaluating a stay that is most favorable to Fuzion, the analysis does not support it.

### III. CONCLUSION

SHIP's motion to stay in deference to the Rehabilitation Proceeding is granted. Fuzion's motion to stay in deference to the Rehabilitation Proceeding is denied. The court previously stayed this action in deference to a case in New York. That stay remains in effect.